DAVID K.W. WILSON, JR.
MORRISON, SHERWOOD, WILSON & DEOLA PLLP
401 North Last Chance Gulch
P.O. Box 557
Helena, MT 59624-0557
406-442-3261 Phone
406-443-7294 Fax
kwilson@mswdlaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| LIBBY PLACER MINING COMPANY, | Cause No. _____ |
| Plaintiff, | |
| v. | |
| UNITED STATES FOREST SERVICE; U.S. DEPARTMENT OF AGRICULTURE; and CHRISTOPHER SAVAGE, in his official capacity as Forest Supervisor of the Kootenai National Forest. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff, Libby Placer Mining Company ("LPMC"), files this action for declaratory and injunctive relief arising from Defendants' unlawful approval of the Record of Decision ("ROD") signed by Christopher Savage, Forest Supervisor of the Kootenai National Forest on February 12, 2016, the Final Environmental Impact Statement for the Montanore Project issued by the Kootenai National Forest in March, 2015 ("FEIS"), as well as the Joint Final Environmental Impact Statement ("JFEIS") for the Montanore Project ("Project" or "Mine") issued by the Kootenai National Forest ("KNF") Supervisor on February 12, 2016. This lawsuit also challenges the July 22, 2015, Combined Response to Objections for the Montanore Project signed by the Deputy Regional Forester for the Northern Region of the U.S. Forest Service, which responded to the objections filed by Plaintiff in May, 2015.

2.      Pursuant to the ROD, Montanore Minerals Corporation ("MMC") will be allowed to construct and operate the Montanore Mine.

3.      The proposed Montanore Mine, a large copper and silver underground mine and associated facilities, will significantly impact a remote valley on the East side of the Cabinet Mountains, bringing large-scale industrial activity and impacts to Plaintiff's property.

4.     Adverse impacts to Plaintiff's property from the mine will include permanent changes to the landscape immediately west of the property; traffic and congestion on the Libby Creek Road through Plaintiff's property; dewatering of Poorman Creek and Libby Creek as they run through Plaintiff's property; noise and dust; and contamination of the groundwater.

5.     The State of Montana Department of Environmental Quality ("DEQ") determined that the Project as authorized in the USFS ROD would violate Montana state laws and regulations designed to protect water quality, fisheries and fisheries habitat from degradation. DEQ ROD, February 12, 2016. As a consequence, DEQ, the Forest Service's co-permitter on the project, approved only the first phase of the project, the evaluation adit. DEQ has not approved the full-development of the mine, as Kootenai National Forest has, and certain elements of the USFS approval depend upon future DEQ approval, which of course has not yet occurred and may never occur.

6.     This suit challenges the United States Forest Service's failure to comply with mandatory procedural and substantive requirements governing the Forest Service's approval of mining and other activities on National Forest lands for the Montanore Project proposed by Montanore Minerals Corporation ("MMC").   These violations include failure to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*. ("NEPA"); Forest Service

Organic Administration Act of 1897 ("Organic Act"), 16 U.S.C. §§ 478, 551; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the implementing regulations of these laws. To address these violations, Plaintiff seeks declaratory and injunctive relief.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question); 1346 (United States as defendant); 2201 (declaratory relief); 2202 (injunctive relief); and the APA, 5 U.S.C. §§ 702 and 706. There is a present and actual controversy between the parties.  Plaintiff seeks a declaratory judgment and injunctive relief to remedy the violations complained of herein. Plaintiff also seeks an award of costs, including attorney and expert witness fees. Equal Access to Justice Act, 28 U.S.C. § 2412(d).

8.     Venue is properly vested in this District (District of Montana) pursuant to 28 U.S.C. § 1391(e), as a substantial part of events/omissions giving rise to this suit occur in this District, the lands at issue in this suit are located in Lincoln County, and the regional headquarters of the U.S. Forest Service is in this District.  The headquarters of the U.S. Forest Service, Northern Region, is in Missoula, Montana.

## PARTIES

9.     Libby Placer Mining Company, a private Montana corporation, founded in 1902, owns over 1,000-acres of private land adjacent to the proposed Montanore project facilities. Libby Creek, the principal stream in the Montanore Project area, flows through approximately three (3) miles of LPMC land.  The proposed tailings impoundment for the Montanore Project is sited less than 300-feet west of LPMC property, and as the record shows and this Complaint will detail, LPMC property will be heavily impacted by the Montanore Project. LPMC's lands and interests will be adversely affected, permanently and irreparably injured by the Forest Service's failure to comply with federal law as described herein.

10.    The Plaintiff submitted extensive comments to the Forest Service and the State of Montana during the environmental review and permitting process for the Montanore Project, and most recently submitted objections to the draft ROD in 2015.

11.    Defendant United States Forest Service ("Forest Service") is an agency of the United States Department of Agriculture.  The Forest Service and its officers are responsible for implementing all laws and regulations relating to the management of the National Forests, including the Kootenai National Forest ("KNF").

12.    Defendant United States Department of Agriculture is a cabinet-level

Department within the executive branch of the federal government. Defendant, Tom Vilsack, is the Secretary of Agriculture. The U.S. Forest Service is an administrative agency within the Department of Agriculture.

13.   Defendant, Christopher Savage, is the Forest Supervisor for the Kootenai National Forest, within which the Montanore Mine is proposed. Mr. Savage signed the February, 2016 ROD. Mr. Savage is sued in his official capacity as Forest Supervisor.

## FACTUAL AND REGULATORY BACKGROUND

### *Description of the Area of the Proposed Mine*

14.   The Cabinet Mountains in Northwestern Montana encompasses some of the best remaining remote and wild habitat in the contiguous United States for grizzly bears, lynx, bull trout, westslope cutthroat trout, harlequin duck, wolverines, mountain goats, and other threatened, endangered and sensitive plant and animal species. Its waters are pristine, the landscape wild and rugged. The Cabinet Mountain Wilderness lays to the west of Plaintiff's property, and the proposed mine.

15.   Plaintiff LMPC owns 1,070-acres of land to the east of the Cabinet Mountains Wilderness area, and adjacent to the Montanore Project. Libby Creek, which runs through LPMC property for three miles, is classified as high quality waters. Additionally, the Libby Creek Road, FS Road 231, runs through LPMC

property. (JFEIS, Vol. 4, Figure 2) The area is currently heavily timbered. Plaintiff has two cabins on the property, and the property is regularly used throughout the spring, summer and fall.

16.     MMC proposes to construct a massive copper and silver underground mine, with associated facilities, including a tailings impoundment immediately to the west of LPMC property. (JFEIS, Vol. 1, S-1, S-9; Vol. 4, Figure 3).

17.     The Montanore Project has a long and convoluted regulatory history. The mineral deposits that form the basis for the project were first discovered in the early 1980s, when Heidelberg Silver Mining Company located mineral claims in the Project area.  Heidelberg merged with Newhi, Inc., in 1988, and the mineral interests were then assigned to Noranda Minerals Corporation (Noranda). Noranda first obtained an exploration permit for the project from the State of Montana[1]. Noranda partially completed an exploration adit on upper Libby Creek.  Although construction ceased on the exploration adit in 1991 in response to elevated nitrates in surface water and low metal prices, the Montana Board of Health and Environmental Sciences ("BHES") issued an order in 1992 approving Noranda's "Petition for Change in Quality of Ambient Waters", and the Department of State Lands ("DSL", DEQ's predecessor), in the same year, issued a ROD and Hard Rock  Operating Permit #00150. In 1997, DEQ issued Montana Pollution

---

[1] At the time, the name of the agency was Montana Department of State Lands ("DSL"), but it subsequently changed to Montana Department of Environmental Quality ("DEQ").

Discharge Elimination System ("MPDES") permit MT0030279 to Noranda. By 2002, many of the permits for the Project had expired or terminated, and Noranda notified the agencies that it was abandoning the project and relinquishing the authorizations to operate the mine.  DEQ's Operating Permit #00150 and the MPDES permit, however, remained in effect because reclamation of the exploration adit was not complete. (*See generally* JFEIS, Vol. 1, pp. 3-6*)*

18.    In 2004, MMC submitted various applications to re-start the permitting process for the Montanore Project, culminating in the ROD at issue in this litigation*. (Id.)*

19.    As originally proposed by MMC, the Montanore Project would consist of a 12,500-tons-per-day underground mining operation that would expand eventually to 20,000 tons-per-day. The surface mill would be located on Forest Service land in the Ramsey Creek drainage.   The ore body would be accessed from two adits adjacent to the mill site.  Two other adits, an exploration/ventilation adit and a ventilation adit, would be used during the project. The exploration/ventilation adit would be located in the upper Libby Creek drainage. The mineralized resource associated with the Montanore sub-deposit is approximately 135 million-tons. MMC anticipates mining up to 120 million-tons. Mining operations would continue for an estimated 16-years once the mining operations begin.   As proposed, the mine permit area would be 3,628 acres of

which 2,583 acres would be disturbed.  (JFEIS, Vol. 1, pp. 7 and 8)

20.     As originally proposed by MMC, the tailings impoundment was to be located on Little Cherry Creek, approximately 4 miles distant from the Ramsey Creek plant site  (JFEIS, Vol. 1, p. 71), approximately 1 mile distant from LPMC property. However, during the EIS process, the Forest Service and DEQ developed "Alternative 3 – Agency Mitigated Poorman Impoundment Alternative" for a tailings impoundment site north of Poorman Creek.  (*See generally* JFEIS, Vol. 1, pp. 123-210) In the ROD, the Forest Service adopted this alternative as the selected alternative.   (ROD, p. 7) Although LPMC has many concerns about the mine project as proposed and approved, its primary concerns here focus on the location of the tailings impoundment, and its documented impacts to LPMC property and on Forest resources.

### *Impacts from the Poorman Tailings Impoundment on Plaintiff's Property and Forest Resources*

21.     Under the selected alternative, the Poorman Tailings Impoundment site lies on a broad east-facing slope between Little Cherry and Poorman Creek, and would be developed to hold up to 120-million tons of tailings, along with support facilities.   LPMC property lies less than 300-feet east of the tailings impoundment dam alignment.   The main dam feature of the tailings impoundment would rise 270-feet above the Rock Toe Berm, and almost 300-feet above the surrounding landscape.   The final crest length of the dam would be 10,300 feet,

and the main north-south axis would be almost a mile long.  (JFEIS, Vol. 4, Figure 3) Tailings would be shipped to the impoundment by means of a slurry pipeline from the Ramsey Creek plant.

22.    The record alludes to, but does not fully evaluate, the impacts that the Poorman Tailings Impoundment would have on LPMC property, and on Forest resources in general.    The scenic integrity of LPMC property would be "permanently and substantially altered", due to the "mostly unobstructed view of the 270-foot high impoundment dam face." Blowing dust may impact the air quality of the LPMC property. Noise levels from heavy machinery will adversely impact LPMC property. While the ROD alludes to mitigation measures being developed to address these issues, those mitigation measures are not completed yet, and their effectiveness is unknown. (ROD, pp. 36-39)

23.    Contamination of groundwater under LPMC property is projected to occur. (Klohn Crippen Berger Montanore Project Risk Assessment, March 6, 2009, pp. 45-49)  While the ROD states that a pumpback system downgradient from the impoundment will be designed to capture all seepage from the impoundment (ROD, p. 38), it also acknowledges that MMC will need to obtain a mixing zone extending 5,000 feet east of the impoundment – through Plaintiff's property. (ROD, Attachment 1, p. 33) Indeed, the Forest Service projects that predicted concentrations in groundwater of Antimony and Manganese will exceed applicable

nondegradation standards set by the State of Montana. (JFEIS, Vol. 2, p. 755, Table 131)

24.     MMC's consultants projected additional risks to Forest resources from the use of the Poorman Tailings Impound. The projected dam slope of 2.5H:1V may be problematic as the slope may be too steep "if potential weak materials are encountered at the dam foundation." "The dam toe cannot extend beyond current limits because of the private property" (i.e. LPMC property), and the location of Libby Creek only 200-feet away from the dam. As a consequence, the facility does not have any room to expand, so any slight deviation in design assumptions, such as solids content and tailings density, may result in major design challenges. Finally, the Poorman Tailings Impound site carries more risk than the Little Cherry Creek Tailings Impound site due to the complexity of operations and a higher amount of infrastructure which would likely lead to a higher frequency of mechanical breakdowns and operator errors. (*Id.*)

### Arbitrary and Inconsistent Application of Review Criteria to Poorman Impoundment Site

25.     The Forest Service review process that resulted in the Poorman Creek Impoundment being chosen was deeply flawed, and the full impact, both to Plaintiff's property and Forest resources, is impossible to determine because many of the studies which would determine impacts have yet to be completed.

26.     The Poorman site was originally identified as a potential tailings impoundment site in the Kootenai National Forest Mineral Activity Coordination Report (the "MAC Report") on mineral activity in the Cabinet Mountains in 1986.

27.     The Poorman site had been evaluated for Noranda Minerals Corporation by Morrison Knudsen Engineers (1988/1989) (the MKE Report) in connection with MKE's evaluation of tailings impoundment sites and was rejected at that time due to insufficient capacity and the presence of artesian conditions. (JFEIS, Vol. 1, p. 258)

28.     The Poorman site was resurrected by the Agencies for renewed consideration in connection with the Montanore Project in 2006/2007. (*Id.*)

29.     After preliminary review of the Poorman site by the Agencies, the U. S. Corps of Engineers requested the Agencies re-evaluate the impoundment sites evaluated in prior alternatives analyses consistently in accordance with Clean Water Act "Section 404(b)(1) Guidelines[2]". (*Id.*)  For prior analyses, the evaluation criteria differed among the analyses and did not address all current issues associated with regulatory changes. The Poorman site was one of the alternatives evaluated in prior analyses. The re-evaluation was performed by ERO Resources Corp. ("ERO") and is described in ERO's September 2011 report "Final Tailings Disposal Alternatives Analysis for the Montanore Project."  As detailed in the EIS,

---

[2] 13 U.S.C. § 1344, which covers discharge of dredge or fill material into waters of the U.S.

three successive levels of screening were used to the narrow the range of tailings impoundment options analyzed in detail in the Montanore EIS. Level I criteria looked at availability and logistical criteria; Level II criteria looked at environmental considerations; and Level III criteria looked at engineering, geotechnical and environmental considerations. (*Id.*) All of the sites needed a minimum capacity of 120-million tons of tailings. (ERO Report, § 5.2.2.1, p. 45).

30. For Level I screening analysis, the impoundment sites evaluated were the conceptual layout developed for the agency modified Little Cherry Creek impoundment site, the conceptual layout developed by the Agencies for the Poorman site, and twenty other potential impoundment sites on the Forest developed for the MAC Report and the MKE Report. (JFEIS, Vol. 1, p. 259)

31. To standardize disturbance areas for the impoundment sites during the screening, a 2,000-foot buffer was applied to **each** impoundment footprint (the disturbance area) developed and reviewed in the MAC Report and for the MKE Report. (*Id.*) The Poorman site option developed by the agencies in 2006/2007 was used in this alternatives screening analysis, replacing an earlier Poorman site originally identified in the MAC Report.

32. The 2,000-foot buffer, however, was *not* applied to the disturbance area for the Poorman site (or the Little Cherry Creek site), even though it was applied to all of the other sites evaluated**.** This means that the evaluation criteria

still differed among the impoundment sites as the standardization criteria were not applied to all the sites considered in the re-evaluation as mandated by the Corps of Engineers. All but four of the original twenty sites were eliminated using Level I and Level II screening criteria. (JFEIS, Vol. 1, pp. 259-260)

33.    The third level of review, the Level III screening, focused on four tailings impoundment sites that were still in consideration, the Agency modified Little Cherry Creek site, the agency developed Poorman site, and two other sites called Crazyman Creek and Upper Hoodoo Creek sites, respectively.  The 2,000-foot buffer was applied to both the Crazyman site and the Upper Hoodoo site (but not to the Poorman site). (JFEIS, Vol. 1, p. 260)

34.    The facts as detailed in the ERO Final Tailings Disposal Alternatives Analysis and the EIS show that the screening criteria developed by the Agencies was not applied in a uniform manner.  The 2,000-foot buffer that was used in evaluating all of the other potential tailings sites was not applied in the case of the Poorman or Little Cherry Creek sites.

35.    When this omission was raised by Plaintiff with the Agencies in the Objection process in 2015, the response was that the Agencies had already expanded the area around the Poorman impoundment site prior to the time of the Level I screening analysis, and therefore applying the 2,000-foot buffer was not needed.  The Agencies state (JFEIS, Vol. 1, p. 259) that the reason the Poorman

site (and the Little Cherry Creek site) did not have the 2,000-foot buffer applied to them in the Level I screening was because the Agencies had already established a "disturbance area" around each impoundment that would be adequate to accommodate each impoundment (i.e., Poorman and Little Cherry Creek) and all associated disturbances. However, the agencies do not state how much the Poorman and Little Cherry Creek sites were enlarged, and whether and how the enlargement was consistent with the 2,000 foot buffer.

36.    Moreover, the impoundment disturbance area does not "surround" each impoundment.  The disturbance area is the impoundment footprint and the 2,000-foot buffer zone is intended to surround the disturbance area with an undisturbed area.  The Forest Service's explanation essentially mixes apples and oranges.  Further, it fails to explain why the Poorman site (and the Little Cherry site) were not subject to the evaluation criteria that were applied to every other site as required  by the Section 404 Guidelines, and that were applied to other sites evaluated.  The whole point of the Corps of Engineers' mandated re-evaluation was to compare each site using *the same criteria*.  This was not done in the case of the Poorman and Little Cherry site.  The Agencies' argument that it was not needed because the "disturbance area was already known" is beside the point, because if the 2,000 foot buffer had been applied to the Poorman site, it would not have qualified under the minimum capacity criteria of 120-million tons of tailings.

In addition, if the 2,000 foot buffer had been applied to the Poorman site, the impoundment would be 2,300 feet away from Plaintiff's property instead of 300-feet away.

37.    The Forest Service failed to follow the standardized criteria that were established for tailing site evaluation and accordingly acted arbitrarily and capriciously in failing to take the requisite "hard look" at potential environmental impacts from the selection of the Poorman Impoundment Alternative for the Montanore Project.

### The Poorman Site was Improperly Chosen Based on Incomplete Data and Scientific Information

38.    The tailings facility design is conceptual only. Although MMC submitted a detailed engineering design and 585-page site investigation analysis for the Little Cherry Creek tailings impoundment (alternative 2), which was evaluated in the FEIS analysis, similar detailed information and analysis wasn't performed for the Poorman tailings facility (the chosen site in the ROD).

39.    The JFEIS and ROD acknowledge that critical Project information and designs for major facilities such as the 600+ acre tailings waste impoundment facility have yet to be gathered, and will only be obtained during the Evaluation Phase.

> The design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, **is conceptual** and is based on the **available** geotechnical investigations. **Additional site**

**information is needed to complete a final design.** The design process would include a **preliminary** design phase and a **final design phase**.

(JFEIS, Vol. 1, pp. 134-35, emphasis added).

40.     Addressing the lack of substantial data for the tailings waste facility design, the March 2015 FEIS stated: "The design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, is conceptual and is based on **limited** geotechnical investigations." (March, 2015 FEIS, Vol. 1, p. 132 (emphasis added).

41.     In the December 2015 JFEIS, the agency changed its description of the missing information: "The design developed for project facilities in Alternatives 3 and 4, such as the Poorman tailings impoundment site, is conceptual and is based on the **available** geotechnical investigations." (JFEIS, Vo. 1, 134, emphasis added).

42.     However, no additional analysis or geotechnical investigation was performed by the agency in preparing the JFEIS.  Thus, no detailed site analysis was completed to confirm whether the Poorman Tailings Impoundment site is geotechnically suitable and supported by sound engineering design.  The change in language appears intended to mask the clearly insufficient data currently available to decision makers.

43.    The JFEIS acknowledges that it is "uncertain" whether the Poorman

site *can even handle* the anticipated 120 million tons of tailings.

> The Poorman Tailings Impoundment Site would not provide sufficient
> capacity for 120 million tons of tailings without a substantial increase
> in the starter dam crest elevation if tailings were deposited at a density
> proposed in Alternative 2. The tailings thickener requirements to
> achieve higher tailings slurry density (and hence higher average in-
> place tailings density) are uncertain without additional testing of
> simulated tailings materials. Such testing would be completed during
> the Evaluation Phase.

(JFEIS, Vol. 1, p. 153.)

44.    In the ROD, the Forest Service further highlighted this uncertainty by

noting that if the mixing zone beneath and below the Poorman Tailings

Impoundment was not approved, "MMC will develop a revised approach to

tailings disposal that does not require a mixing zone." (ROD, p. 38)

45.    The Forest Service has not collected the necessary scientific data to

adequately describe the impacts to private property and Forest resources from the

use of the Poorman site.

### *Impacts to Water Quality Affecting LPMC Property*

46.    As noted above, ¶ 23, the Forest projects violations of groundwater

standards for Antimony and Manganese down-gradient from the tailings

impoundment.

47.    Additionally, the Forest projects excessive reductions in flow in

Poorman Creek as it enters Plaintiff's property. The JFEIS projects a reduction in

base flow in Poorman Creek of .18 CFS. (JFEIS, Vol. 2, p. 596) The reduction in base flow for Poorman Creek at measuring site PM-1200, adjacent to the boundary with the LPMC property, is 11.6%. (Biological Opinion, p. 102)  This will adversely impact essential Bull Trout habitat.  Moreover, there will be a 16% reduction in flow in Libby Creek less than 2-miles upstream of Plaintiff's property at monitoring site LB 300. (JFEIS, Vol. 2, p. 595, Table 99; Vol. 4, Figure 76.)

48.    These reductions in flow are considered significant changes to water quality. A.R.M. 17.30.715 (1) (a)(stating that flow depletions are insignificant, and not result in degradation, if they involve a reduction in flow of less than 10% of stream base flow.) No mitigation is proposed to prevent the degradation of Poorman and Libby Creeks.

49.    The Forest also projects significant stream reductions within the Cabinet Mountain Wilderness, which would violate the State of Montana prohibition on degrading outstanding resource waters.  (JFEIS, Vol. 2, pp. 602 and 707)

50.    In order to purportedly show compliance with its own regulatory requirements, the Forest Service depends on future Montana DEQ permitting decisions. (ROD, pp. 52, 58)

51.    Yet, simultaneous with the release of the USFS ROD, DEQ concluded that it *cannot* fully approve the Montanore project at this point because of projections that it would not comply with nondegradation standards.   (DEQ ROD, p. 18)

52.    The Forest Service's determination that future state and federal permitting decisions will ensure that the Montanore project complies with the Organic Act, and the § 228 regulations, was arbitrary and capricious for failing to protect water quality and fisheries.

### *Summary*

53.    The FEIS and ROD set forth an inadequate and legally insufficient analysis of the reasonably foreseeable direct, indirect, and cumulative effects and incremental impacts that discharges from the proposed Montanore Project will have on downstream waters, Libby Creek.

54.    Plaintiff will be harmed by Defendants' actions and inaction.

### CLAIMS FOR RELIEF

### COUNT I

**Violations of the National Environmental Policy Act (NEPA), its Implementing Regulations, and the Administrative Procedure Act, in Misapplying Evaluation Criteria to the Poorman Impoundment Site.**

55.    Plaintiffs reallege all preceding paragraphs.

56.     NEPA requires federal agencies to prepare an EIS for any proposed major action that may significantly affect the quality of the environment.   42 U.S.C. § 4332(2)(C).   The CEQ promulgated uniform regulations to implement NEPA (at 40 C.F.R. Part 1500) that bind the Forest Service.

57.     Pursuant to the CEQ regulations, agencies must insure the professional integrity, including scientific integrity of the discussions and analysis in environmental impact statements, identify any methodologies used, and make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement.   40 CFR 1502.24 (Methodology and Scientific Accuracy).   Also, 40 CFR § 1502.1 mandates that NEPA documents be supported by evidence that the agency has made the necessary environmental analysis.  The Forest Service has a duty to disclose the underlying scientific data and rationale supporting the conclusions and assumptions in the FEIS. Unsupported conclusions and assumptions violate NEPA.

58.     The Forest Service violated this requirement in issuing the FEIS and approving the ROD for the Montanore Mine.   As set forth above, the Forest Service failed to disclose underlying scientific data, and mis-applied scientific evaluation criteria, to support the selection of the Poorman Impoundment Alternative in the Montanore EIS.

59.     The Forest Service failed to adequately review all direct, indirect and cumulative impacts from the Montanore Project, specifically impacts arising from the selection of the Poorman Impoundment site, in violation of NEPA and the CEQ regulations.

60.     The Forest Service's actions approving the Montanore Mine project ROD (and the issuance of the JFEIS) are arbitrary, capricious, an abuse of discretion, and is otherwise contrary to NEPA, in violation of the APA, 5 U.S.C. §§ 701-706.

## COUNT II

**Violations of the National Environmental Policy Act (NEPA), its Implementing Regulations, and the Administrative Procedure Act in Deferring Critical Evaluation and Review Until After Permission has been Granted and the Project Begun.**

61.     Plaintiffs reallege all preceding paragraphs.

62.     NEPA requires federal agencies to prepare an EIS for any proposed major action that may significantly affect the quality of the environment.  42 U.S.C. § 4332(2)(C).  The CEQ promulgated uniform regulations to implement NEPA (at 40 C.F.R. Part 1500) which are binding on all federal agencies.

63.     Pursuant to the CEQ regulations, agencies must insure the professional integrity, including scientific integrity of the discussions and analysis in environmental impact statements, identify any methodologies used, and make explicit reference by footnote to the scientific and other sources relied

upon for conclusions in the statement.   40 CFR 1502.24 (Methodology and Scientific Accuracy).   Also, 40 CFR § 1502.1 mandates that NEPA documents be supported by evidence that the agency has made the necessary environmental analysis.  Consequently, the Forest Service has a duty to disclose the underlying scientific data and rationale supporting the conclusions and assumptions in the JFEIS.  Unsupported conclusions and assumptions violate NEPA.  The Forest Service violated this requirement in issuing the JFEIS and approving the ROD for the Montanore Mine.

64.   The Forest Service is required to "describe the environment of the areas to be affected or created by the alternatives under consideration."  40 CFR § 502.15.   The establishment of the baseline conditions of the affected environment is a practical requirement of the NEPA process. By postponing until after the ROD preliminary and final analyses and plans for the Poorman Impoundment Alternative, as set forth above, the Forest Service has violated NEPA.

65.   NEPA requires "the disclosure and analysis of the costs of uncertainty [and] the costs of proceeding without more and better information."  40 CFR § 1502.22.   40 CFR § 1502.22 imposes mandatory obligations on the Forest Service in the face of scientific uncertainty.   The Forest Service has failed to meet these requirements in the face of substantial uncertainty regarding

numerous foreseeable environmental impacts of the Montanore Project –
specifically, deferring determination of the suitability of, and review of many
projected impacts from, the Poorman Tailings Impoundment until after the
JFEIS and ROD were completed.

66.     NEPA regulations require that an EIS: (1) "include appropriate
mitigation measures not already included in the proposed action or alternatives,"
40 CFR § 1502.14(f); and (2) "include discussions of: . . . Means to mitigate
adverse environmental impacts (if not already covered under 1502.14(f))." 40 CFR
§ 1502.16(h).  The Forest Service must evaluate any mitigation measures it adopts
and relies upon in approving an agency action for their effectiveness.  Under 40
CFR § 1505.2(c), the agency is required to: "State whether all practicable means to
avoid or minimize environmental harm from the alternative selected have been
adopted, and if not, why they were not.  A monitoring and enforcement program
shall be adopted and summarized where applicable for any mitigation."  According
to the CEQ, "[a]ny such measures that are adopted must be explained and
committed in the ROD."  Forty Most Asked Questions Concerning CEQ's
National Environmental Policy Act Regulations 46 Fed. Reg. at 18036.

67.     Here, the ROD makes clear that mitigation measures to mitigate the
impact of the Poorman Impoundment on Plaintiff's property, particularly in
reference to dust, groundwater contamination and impoundment stability, have yet

to be developed. (*See, e.g.* ROD, pp. 36-39) Mitigation of the noise is not even addressed. The Forest Service also failed to identify or require mitigation measures addressing the de-watering of Poorman and Libby Creeks. The failure of the ROD and JFEIS to explain or identify the specific mitigation and other requirements, or to explain or specify the monitoring and enforcement programs approved by the Forest Service in the Montanore Mine ROD, violates NEPA.

68.    The Forest Service failed to adequately review all direct, indirect and cumulative impacts from the Montanore Project, in violation of NEPA and the CEQ regulations.

69.    The Forest Service's actions approving the Montanore Mine project ROD (and the issuance of the JFEIS) are arbitrary, capricious, an abuse of discretion, and is otherwise contrary to NEPA, in violation of the APA, 5 U.S.C. §§ 701-706.

## COUNT III

**Violations of the Forest Service Organic Act of 1897, their Implementing Regulations, and the Administrative Procedure Act.**

70.    Plaintiffs reallege all preceding paragraphs.

71.    In authorizing the construction of the Montanore Project, the agency has violated the Forest Service Organic Act of 1897, and its implementing mining regulations, 36 C.F.R. Part 228.

72.     In proposing a mining operation, the applicant must fully describe "measures to be taken to meet the requirements for environmental protection in § 228.8." 36 CFR 228.4(c)(3). These requirements for environmental protection state that the "[o]perator shall comply with all applicable Federal **and State water quality standards**, including regulations issued pursuant to the Federal Water Pollution Control Act, as amended (33 U.S.C. 1151, et seq.)[the Clean Water Act]." 36 CFR § 228.8(b), emphasis added. The agency must also "minimize adverse environmental impacts," 36 C.F.R. §§ 228.1, 228.8 and demonstrate that the mining operators have "take[en] all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations." 36 CFR § 228.8(e).

73.     The Forest Service has not ensured compliance with all of these requirements, especially in failing to address Clean Water Act Section 404 (b) concerns.

74.     Further, the Forest Service's determination that *future* state permitting decisions will ensure that the Montanore Mine project complies with the Organic Act and Part 228 regulations was arbitrary and capricious because evidence before the Forest Service—including its own NEPA analysis—demonstrates that the Montanore Mine project will violate the Montana Water Quality Act's nondegradation policy as proposed, as set forth above. The Forest

Service's own analysis demonstrates that groundwater drawdown caused by the Montanore Mine will degrade outstanding resource waters in violation of Montana's nondegradation requirements, and will significantly de-water both Poorman Creek and Libby Creek as they enter Plaintiff's property. Montana DEQ has yet to approve the project, in part due to concerns with decreases in surface water baseflow.

75.    The current mining plans (and JFEIS and ROD) are not "reasonable" because they are incomplete.  MMC has not submitted a detailed mining plan of operation as required by 36 CFR § 228.4(c)(3) & (d), § 228.8, and § 228.12 and as defined by § 228.3(a). A mining plan of "operations" is incomplete and unreasonable when it does not contain all necessary plans for "operations" as defined by the agency itself. As set forth above, the Forest Service approved the Montanore Mine without a detailed operations plan for the Poorman Impoundment. The Forest Service's assurance that adequate plans will be forthcoming is inadequate under the Organic Act.

76.    The federal court reviewing the USFS's approval of the nearby Rock Creek Mine specifically held that the agency may not rely on future submittals of important information to cure the lack of information in the FEIS.  In *Rock Creek Alliance v. U.S. Forest Service*, 703 F.Supp.2d 1152, 1180 (D. Mont. 2010), the court held that the FEIS violated NEPA in part, "because additional

surveys are needed to better understand bull trout populations and the amount and condition of spawning habitat." The court also held that: "The Forest Service may not address a deficiency in an environmental impact statement through the issuance of a supplemental information report." *Id.*

77. The Forest Service's decision approving the Montanore Mine without ensuring compliance with these federal and state laws, regulations, and standards is arbitrary, capricious, an abuse of discretion, otherwise contrary to the Organic Act, and its implementing regulations, not in accordance with the law, and without observance of procedures required by law within the meaning of the APA. 5 U.S.C. §§ 701-706.

## COUNT IV

**Declaratory and Injunctive Relief.**

78. Plaintiffs reallege all preceding paragraphs.

79. Pursuant to 28 U.S.C. 2201 and 2202, and based upon the facts set forth herein, Plaintiff seeks declaratory and injunctive relief, including a judicial declaration that the Defendants have violated NEPA and the Forest Service Organic Act, and that the Court enjoin any activity pursuant to the permission granted in the ROD pending resolution of this lawsuit.

## REQUEST FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that this court:

A.      Declare that the Forest Service has violated NEPA, the Forest Service Organic Act, the APA, and the implementing regulations and policies of these laws;

B.      Set aside and vacate the ROD, FEIS and JFEIS,

C.      Remand the matter to the Defendants with instructions that if MMC reapplies for permission to mine, that the Forest be required to review the matter fully under NEPA as set forth herein, and specifically to mandate that the agencies apply the 2,000 foot buffer criteria to the Poorman tailings impoundment site, consistent with the tailings impoundment site screening criteria applied to all other alternative tailings impoundment sites evaluated under the NEPA process;

D.      Enjoin the Forest Service from allowing, authorizing or approving mining or mining related operations in reliance on the ROD and FEIS until the Forest Service has complied with these laws and their implementing regulations.

E.      Award the Plaintiff its reasonable fees, costs, expenses, and disbursements, including attorneys' fees under the ESA, 16 U.S.C. § 1540, the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable federal law; and

F.      Grant such additional relief as this court deems just and proper.

DATED this 5th day of April, 2016.

By:  /s/ David K.W. Wilson, Jr.
     David K.W. Wilson, Jr.
     Morrison, Sherwood, Wilson & Deola PLLP
     *Attorneys for Plaintiff*